We have decided to change the order of argument slightly and if counsel for Liquid, the fourth case, are here we'd like to hear that case second after the Grecia case. Are Liquid counsel here? Okay, thank you. All right, so first we'll hear number 17-16-72, Grecia v. McDonald's Corporation. Mr. Wozwin? Wozwin, your honor. Good morning, your honors. Matt Wozwin on behalf of William Grecia. We're asking in this appeal for the court to reverse the district court's dismissal of Mr. Grecia's complaint. The principal reason and the basis for our request is that the district court erred in relying on physical possession of components of the claim system in order to prove liability, or I'm sorry, to plead liability for use under section 271. That holding by the district court that is relying on... So do you dispute that McDonald's does not practice any of the claim limitations itself? We do dispute that, your honor. The main components of the system are the modules that reside in the back end of the accused tokenization system. So those modules are in the physical possession of the credit card companies. So let's take, for example, MasterCard. MasterCard physically possesses those components, but if your honors will look at the preamble language to these system claims, it includes a, for example, worldwide cloud infrastructure including a plurality of devices. Part of that plurality of devices here would be the point-of-sale device at the McDonald's store that is used to transmit the personal account number of the McDonald's customer to the back end, to the six modules that are in physical possession. What language, can you point me to language in a claim that you're talking about? Yeah. Why don't we go to the 860 patent. Claim 9, page 21 of the appendix. If your honors are all there. A system for authorizing access to digital content using a worldwide cloud system infrastructure. The infrastructure comprising connected modules in operation as computing and storage. Now just to focus on that language, those are the six modules that I referenced before that do reside at the back end of the system, not within the control of McDonald's. Not in physical control. What we argue, however, your honor. Or functionally. Well, they're in control under this court's centillion holding because McDonald's is controlling the system as a whole. Well, you're basically saying that use is sufficient, use and benefit is sufficient to bring us under centillion and you don't have to actually control or contribute any of the modules. That's correct. That is our position, your honor. I'm not sure if it makes a difference. I thought one way you could make your point is to say McDonald's is indirectly controlling everything by sending everything that is listed in these modules by indirectly the signal that automatically makes all of it go into service. Yes, and we're relying on this. You were, I think, about to say there's something in here that's actually in McDonald's possession. Put aside the word control. Right. What is that? The computing and storage comprising a server, a database, devices and users. We're in the digital content is at least one of encrypted, non-encrypted. The system facilitating access rights between a plurality of data processing devices. That's where McDonald's comes into the scope of this claim. If you look at the centillion case, for example, which holds that use under section 271 of a system claim requires the right to put the system into service. That's point number one. Where does McDonald's get the right to put the system into service? It pays MasterCard a fee. Just to try to understand what you just said about the sign. Are you saying the plurality of data processing devices that one or more of those devices is provided by McDonald's itself? Yes, and so that would be, as alleged in the complaint, it would be the point of sale device that receives the customer's personal account number or what's referred to as a PAN. Which is the personal credit card information. So one of the data processing devices at issue in this claim, we allege, is the point of sale device in the McDonald's store. What did the district court say about that? Anything? The district court said that we did not allege that in the complaint. However, we Where did the district court say that? The complaint does not plausibly allege that the data processing devices are a component of the claim system. Yeah, well I think that's a true statement that it Actually, that is not true. It doesn't explicitly point out this claim language which we're referring the court to now. However, we did attach these patents to the complaint and, if anything, Mr. Grecia should have been allowed leave to replead and explicitly incorporate this language. When McDonald's filed, this is the theme of their motion is every physical piece of this system is in somebody else's hands. That's a little bit different and that little bit little bit of difference makes a giant legal difference from Centillion. Did you respond and say, ah, premise, you know, we think you're wrong about Centillion, but also the premise of your argument is wrong if you read these claims properly and that's going to be a matter for claim construction later in the proceeding. There is actually a physical component in McDonald's possession. Did you say that to the district court? We did, your honor. It's escaping me whether or not that came up in our motion to reconsider or if on the the principal motion to dismiss. But in any event, it wasn't in the complaint, right? It was not, it has arisen to date before the court. We did allege, however, that the McDonald's stores contain these point-of-sale devices. We did allege all of this claim language by attaching the patents to the complaint. When the court granted the motion to dismiss, did you ask to be able to amend your complaint? Yes, we did, your honor. And what did the district court say about that? The district court said that because these data processing devices that would, this language in the preamble doesn't extend to the six components, which we cannot I'm asking where did the district court say that? In other words, you're saying, okay, there was the motion to dismiss, the motion to dismiss was granted, we asked for leave to amend, and the district court denied leave to amend. I'm just asking where in the record do we find the denial of the motion for leave to amend? You would find that on the docket of the district court. You didn't put it in the appendix? We did not, your honor. And what did he say in denying leave to amend? Judge Coleman said that it was that because we had alleged in the original complaint that there was no physical control over the six components and that this preamble language was of no moment and that we could not, even if we amended the complaint, could not plausibly allege use liability under section 271. Did you brief the denial of the motion for leave to amend here in your the motion to dismiss based on centillion? Let me just say, just so you're on the same page I am, I think everybody agrees that on the facts as understood by the district court on the motion to dismiss, on the facts the case is a little bit different from centillion. To my mind, at least, that leaves the question should that difference make a legal difference? And I do not personally find that a particularly easy question. We have briefs in which the two parties talk about two cases and nothing else, nothing about the history of the use term in the statute and the history of the use term in Supreme Court precedent. You're standing here and saying, well, actually the case really doesn't involve, let's call it, the hard question of a pure use of system assertion where the entire system is in somebody other than the user's hands. If that's a hard question, one reason it might not be necessary to answer that question is if you actually wanted to or tried to plead or ask for further proceedings on claim construction but you don't seem to have raised that. Your Honor, let me address that Gratia is, his position is that centillion does control here. In that case, this court held that physical possession of the components has nothing to do with the use analysis. But you're putting us in a position where we have to decide that issue because you haven't bothered to brief the denial of the motion for leave to amend where, as I understand what you're saying, you did say that McConnell supplied one of the components, the point-of-sale device. So what is the address that and find that those components that you also enumerated that they're not claim components. When you look at the claims, they don't speak about a computer. They talk about different modules and not a computer. Yes, Your Honor. Let's take centillion, for example, where the custom... Answer my question as to the claims and what they say. Well, the preamble is itself limiting. No, it's not limiting. Our position that it is limiting, Your Honor. Okay. It's claim nine, for example, is defining the system, listing the modules, and as a separate component, this plurality of data processing devices. In which these modules operate. The modules don't operate in isolation, but rather they need these other elements of the claim. Part of which is the data processing devices, which McDonald's does physically possess, and which sends the query to the back end of the system, just like in centillion. Okay, but can I understand this? Are you saying that the only module provided by McDonald's, the point of sale device, is only referenced in the preamble and not in the... That's correct, Your Honor. Okay. All right. We're out of time. All right. I'll give you two more minutes. Thank you. Mr. Rice? Good morning, Your Honors. To address briefly the threshold question that was raised here, whether there's a fact issue, I'd like to address that. That's been waived. There was no argument in opposition to the motion for a point of sale device that McDonald's is operating. I think they would agree with that. They said they moved for a leave to amend after the motion of dismissal was granted and raised this point. Is that correct? There was a motion for reconsideration of the dismissal. Did they ask for a leave to amend as part of that? They did ask for a leave to amend, and that was denied in part on the request that in the initial opposition to the motion to dismiss. Okay. Is that a rule in the Seventh Circuit? Is that where we are? The Seventh Circuit, that you have to ask for leave to amend in the alternative when opposing motion to dismiss? Not specifically, Your Honor, but the rule in the Seventh Circuit is on a motion for reconsideration, you can't raise issues for the first time, and that was not an issue that was raised in opposition to the original motion. So when, for example, a district court in the Seventh Circuit dismisses a civil rights complaint for Iqbal Twombly reasons, and then the plaintiff says, well, give me leave to amend, the answer is no, you can't do that because you didn't say that the first time. I think, Your Honor, the rule, as I You can ask for denial of the motion or, in the alternative, leave to replead and raise that issue. And if you don't ask the second thing, you can't ask for it after the motion, after the dismissal? You may be able to, Your Honor, in a motion for leave, as you suggested, but not in a motion for reconsideration. I think the procedural context in which that issue came up is a little bit different. It you asked for leave to amend in the motion for reconsideration instead of in a separate pleading, so it's going to be denied. Is that what you're saying? I'm not really arguing that that should be the rule, Your Honor, but I think the way the district court, in fact, addressed the issue was in the context of a motion responding to the motion for reconsideration. She cited the Federal Circuit standard for reconsideration motions and had a rather thorough opinion responding to the reconsideration request applying the factors in the Seventh Circuit, and found that there wasn't sufficient grounds for reconsideration. However, I don't believe that the leave to replead was a primary issue that the court addressed in a significant way in the decision. Is the denial in that situation, the court's denial, is it with denial of the motion for reconsideration? My understanding is it's with prejudice, but again, that issue hasn't really come up, and I think the other point is, and it seemed to me that Mr. Grisha did not raise that issue in the appeal briefs. Yeah, he agrees he didn't. Okay, so that that's not an issue that that we briefed or addressed for this court, the claim construction issue with the preamble. So my understanding... Do we have a position on that as to whether the preamble is binding? We have not taken a position on that in the record, Your Honor, and we haven't, our view is we hadn't needed to address that issue. There was no need for claim construction because of the way that complaint was pleaded. The complaint did not allege any elements of the system other than the six components, and in fact, the reason why this sort of unusual procedural context arose was because the complaint provided very detailed allegations, reading the claims and the claimed system components onto the credit card system, and so the complaint, in other words, laid out essentially a claim chart where McDonald's didn't appear, and based on that, we moved to dismiss, saying this is a legal question. Mr. Grisha opposed it, and that's basically how the issue comes before the court today. So your opponent says, well, what we did do is we did have a complaint and we attached to the complaint the patent, and in a way, it's almost as if it's up to the court to find, you know, this limiting factors in Claim 9. Is that, is there authority for that in your circuit and some circuit? I'm not aware of any authority, Your Honor, that would support the idea that an argument that's sort of arguably implicit in some submission to the court is that the court has some obligation to dig that out and figure it out for itself. My understanding is that the arguments have to be made explicitly and briefed and addressed in a direct way, and that, I don't believe that was done in this case. You can go on and argue the larger question, the more difficult question of what centellian means, but I think the panel would like both parties to brief this question of whether the motion for leave to amend should have been granted and whether the motion for leave to amend brought this case within centellian because it would then allege that one of the components here was provided by McDonald's. You understand what I'm saying? Yes, Your Honor. So why don't we, we'll issue an order, we may not do it today, is a week sufficient for the two of you, simultaneous briefs? Yes, Your Honor. Okay, why don't we give you, yeah, yeah, simultaneous briefs. I think probably do it in five pages, five pages each. That would be helpful to us. Yes, Your Honor. And just to be clear, I don't think we're expecting responses and reply briefs. Just a single position. Just one brief each, yeah. That's fine, Your Honor. So why don't we move on to the more difficult question, or maybe it's not more difficult, to the question of whether centellian, and which has been elaborated in intellectual ventures more recently. Have you read intellectual ventures? So, Your Honor, the... Did you know about intellectual ventures? I'm not aware of the discussion. Well, it's not cited by anybody in the briefs. It's a more recent case, I think from September. Judge Toronto and I were on the panel, which elaborates on the meaning of centellian. But, so let's talk about whether there's infringement if you use a system and benefit from it without controlling, directly controlling any aspect of the system. Okay, so, Your Honor, if you look at McDonald's' cites to the Unilaw case, they're very similar cases in certain respects, and in fact, they were decided pretty close in time to one another. And they both address a similar fact situation. Our view is they need to be reconciled, and there's really only one way to do it. In both of those cases, there is a system claim, which claims an internet-based system that has a front end and a back end. The front end is the end user that has a personal computer, that sends a signal into the back end. By the way, what's the end user using? The end user, using in the colloquial sense of the word, is using the personal computer. The personal computer is sending a signal into the system, and the system... The end user of the system. I'm sorry? It's not the end user of the system. I think that a distinction needs to be made between using in the colloquial sense and using in the sense of infringement for patent law purposes, and I think the distinction is made by what the claims say. I think as in every infringement analysis, you start with the language of the claims, and in both Centillion and in Unilock, this court properly went first to the claims to see where the boundary lines were drawn. In the Centillion case, the court said very explicitly that this was a question of a system that included components within the claim boundaries where they had more than one operator. There are multiple operators, and so the court said in that case, we have never directly addressed the issue of infringement for use of a system claim that includes elements in the possession of more than one actor, and our shorthand word for that is a system. In this case, what are the claim limitations that McDonald practices, if any, in your view? None, Your Honor. So for McDonald's purposes, are you sending data and then receiving back, or are you just receiving? So sending and receiving from a point outside of the claim system. So McDonald's has a point-of-service device, like a card reader, so when someone comes to buy a burger from McDonald's, either the customer will swipe a card or the person behind the register will swipe the card. A signal gets sent into a system which allegedly practices the claimed invention, and the six system components in the claim are all at the back end, which is owned by the credit card company, whether it's MasterCard or CreditCard, and the claim addresses a tokenization process, a verification, essentially a security method, which is all contained within the six components on the credit card system. So McDonald's would send a signal into the claim system from outside of it and would receive a signal back. So when you hear your opponent's arguments, is the argument that McDonald's is a front-end user or back-end? I believe Mr. Grish's argument is that McDonald's is on the front-end, and in the Centillion case, the counterpart, the end user, was also on the front-end. But the distinction is, in the Centillion case, the front-end components were part of the claimed invention as the claim was drafted. Here it's not, and in that sense, our case is exactly like the Unilock. In Unilock, Microsoft operated the back end of the system. Microsoft's customers sent signals in and received signals back, just as in the Centillion case and just as in the present case. The difference is, in Unilock, this court went to the claim language, and Claim 19 in the Unilock case said very clearly that the claimed components included only components in the Unilock case. Yeah, not quite the claimed components, right? Didn't the court say something like there were certain components, the component in the PC, that had to be met, but it didn't, but I think the language was, it was the environment within which the other claimed components had to be used, and Microsoft because it used those other ones in an environment that, in which there was a PC somewhere in the picture, but there had to actually be a PC somewhere in the picture, so it was a claimed component, that Microsoft was a user. It didn't say that, and because the issue was not presented, whether anybody else might have been the user. The issue in the case, Your Honor, was that Microsoft was claiming that it did not have use liability, because it did not control end-users' computers, and the court, as I read Unilock, said that while the user computers are part of the operating environment in which the system operates as a whole, the way the claim was written, the components all read on to the Microsoft was a user. Correct. Not, that didn't, that there was no issue in the case about whether Microsoft was the only. That's correct, Your Honor, and I don't believe this court has addressed the situation where multiple parties were considered users of the same system for the same use. I don't, I don't, you're right, that's not in the Unilock decision, and the question there wasn't whether the user, whether the, excuse me, whether the end-user or PC users were liable. The question was whether Microsoft was liable, but in the... Can I ask you, because I think I'll repeat my statement that it was frustrating to me, that the briefs, which are tiny, discuss two cases, each one of which is not exactly on point on their facts. Different language may be pointing in different directions, but I want to put that aside for a minute, at which point I want to say, well, we'd better widen our field of review to other sources of law, the statute, the history, what the Supreme Court has said about use and what it means, and we have none of that, none of that to tell us when we have two relatively recent cases and we now have a slightly new fact pattern, what do we do with it? So it's not much of a question, I guess. I understand your frustration, Your Honor. I get the gist of your point, and I understand. My response would be that McDonald's position is, the answer from a policy perspective, would be that you have to look at the claims. The claims are primary. The claims define the scope of what the inventor... I think the question is, if the claims define a system and the user of the system is not directly controlling any component of it, is use and benefit enough under the statute to constitute infringement? That's the question. So I think as a policy matter, the answer should be no. Why is that? Because it renders the claims... it undermines the point of the claims. You can claim a system in many different ways. You can claim a single component, multiple components. You can draw the boundary lines wherever you like. If you take the position that anyone who has some... obtained some level... And, and, and, and directly or indirectly controls. Indirectly or indirectly... That's combination. That's correct, Your Honor. So sending a signal in to the... sends a signal in, gets a signal back, and gets a benefit. That's basically what we're talking about. If we say that person is liable for using the system, then regardless of where the claim lines are drawn, then we're undermining the role of the claims. Then we're imposing use liability on someone who is entirely outside the claims, doesn't physically possess or directly control. They can't pull the plug on... they can't change... They can not send the signal. That's true. Here, right, the signal, I gather, it's a premise for the issue we're discussing. The signal does in fact, you know, push the first domino and all the other dominoes to fall right behind it. That there's no, there's no question about, about, you know, the rest of Centillion's facts being present. When McDonald's sends the code into MasterCard, all the rest happens for purposes of this motion. That's correct, Your Honor, but by the same token then, if we're operating outside the claims and saying someone that does not directly possess or control is liable, then perhaps the claims, where do we, how far do we go and where do we end? And I think McDonald's position is, the proper rule is to look at the scope of the claims and our understanding of the Unilock decision, as this is what the judge or the court did in Unilock, is to say if you look at the claims, you have to distinguish between the greater operating environment, which is not claim specific, and what the I'm sorry, would I be right in, I guess, wondering about the following. Lots of patents, I think actually at least one of these has both method and system claims, right? And if you were operating in a world in which you were worried as to the method claims about divided infringement, you would write a method claim exactly like these system claims. That is, everything in-house, receiving, not sending, so that it's all done by one person. And then you want to capture exactly the same thing you're saying when you write the system version. You really shouldn't do that. You really ought to put in the sending and not just the receiving in order to capture the one who is actually controlling the thing, indirectly but actually. Is that odd? I assume you're gonna say it's a little matter of drafting. I think you're saying that the problem could be solved by claim drafting, is basically what you're saying. Correct. I think that's right. I think the problem could be solved by claim drafting. And in the case of a system claim, you don't have to worry about the divided infringement issue in the way you do for a method claim. But now the drafting issue, right, requires you actually to write the divided infringement and the system claims differently instead of in parallel. That's correct. I'd write them a little differently. I think that that would solve the problem in a way that the current law, as it's understood, could address the problem without the court having to change anything or make new law on that issue. So let's, in a recent case of intellectual ventures, which I don't know if you read it, it wasn't that we held this, that a benefit must be received from the performance of every claim limitation. A benefit must be received from the performance of every claim limitation. Now let's look at the 860 patent. And at the end of, so column 16, line 26, there's a similar limitation in the other patent. But here it says a branding module writing at least one of the verification token or the identification reference into the metadata. What benefit does McDonald receive from that? I'm sorry, could you give me the line number again, please? 26, column 16. Branding module. It's on appendix 21. It's speaking about the branding module. Do you know what the branding module is? I don't believe that there's a branding module. I know there's not a branding module that is in McDonald's direct control. I don't know. But what do they allege is the branding module? Oh, in the complaints. Yeah, they say, they map all these elements on. So what do they say it is? They map it onto a credit card, something within the server on the credit card system. It's a token that makes it easier to process a follow-on transaction involving the same credit card. Correct. That's basically what it is. And so Judge Rainer's question is... So what benefit do you get out of that? Yeah. Oh, I see. I think under that, I'm not sure... It makes it easier for Visa to process by recognizing the make it easier. I understand. What benefit do you get out of that? Does it help you sell more burgers? I don't believe so, Your Honor. I don't think that there would be any benefit from McDonald's in that component. And so... You might want to read Intellectual Ventures. I will. Absolutely, Your Honor. Okay. We're out of time. Thank you, Mr. Warren. Your Honors, I'll just use my two minutes to address Judge Rainer's question. The branding module, as Judge Dyke alludes to, writes the token to be associated with the customer's credit card information. The token is then used at the point of sale. And so McDonald's benefits from that in a number of ways. Primarily, it's a more secure transaction that is not as susceptible to fraud. Also, there's a more practical benefit. If the transaction is hacked, is McDonald's liable for that? As of October 2015, yes. Is this in the complaint? It is not. But this token from the last element of the claim is put into McDonald's hands? Or into the device that's on McDonald's counters? Yes. The token is used to process the transaction. But it's not in the point-of-sale device, is it? You just said it was, but this may not be unimportant. It's alleged in the complaint that the token is used to process the transaction. Well, yeah, sure. But by Visa, right? It's a database maintained... Wait, is that right? It's used by Visa to process the transaction. Correct, but we're dealing with an intangible system. It can't be that the token is stored in the point-of-sale device, because then if you went to a different McDonald's with a different point-of-sale device, the token wouldn't be available. It's got to be in the Visa system. This is on a motion to dismiss the complaint. We're alleging that the token is used to process the transaction. Well, but it's different than whether it's within the point-of-sale device. It just doesn't make sense to me that it would be in the point-of-sale device. All right, thank you, Your Honor. Okay, thank you. I thank both counsel. The case is submitted.